IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JAMI MAYHEW, individually and as sole owner of PRIMARY HEALTHCARE SOLUTIONS, INC., | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. 18-cv-2177-RJD ) ) |
| GENERAL MEDICINE, PC, and DR. THOMAS M PROSE, | ) ) ) |
| Defendants. | ) ) |

## MEMORANDUM AND ORDER

**DALY, Magistrate Judge:**

This matter is before the Court on Defendants' Motion for Summary Judgment (Doc. 37). Plaintiff filed a response which included a cross-motion for summary judgment on Plaintiff's declaratory judgment claim (Doc. 79). Defendants filed a Reply (Doc. 81). For the reasons set forth below, Defendants' motion is **GRANTED, and Plaintiff's cross-motion is DENIED**.

### Background

Plaintiff Jamie Mayhew, a licensed nurse practitioner, began working for Defendant General Medicine in October 2007 (Doc. 80 at 1, 81-4). Plaintiff has an Associate Degree in Science, a Bachelor of Science Degree in Nursing, and Master of Science Degree in Nursing MSN FNP (Docs. 37-11, 37-12). Plaintiff is licensed by the State of Illinois Department of Professional Regulation as an advanced practice nurse who is authorized to prescribe controlled substances as authorized by a physician (Doc. 37-13). General Medicine is a medical company providing medical services at nursing home facilities (Doc. 80 at 8). Defendant Thomas M. Prose, M.D. is President of General Medicine (Doc. 37-4 at 1).

When Plaintiff began her employment with Defendant, she was hired as a nurse practitioner and paid on a salary basis (Doc. 37-1 at 9). In the compensation plan, Defendant General Medicine agreed to provide Plaintiff healthcare benefits, paid time off, continuing medical education reimbursement, malpractice insurance, and a retirement plan (Id.). The initial Employment Agreement contained a non-compete provision, which provided that Plaintiff was prohibited from competing with Defendant within a 20-mile radius for a period of three years (Id. at 4). The Agreement also contained a forum selection clause in favor of the Circuit Court for the County of Oakland, State of Michigan (Id. at 5).

On October 16, 2014, Plaintiff re-negotiated her compensation (Doc. 80 at 1). Plaintiff and a representative of Defendant signed a "Letter of Understanding" modifying Plaintiff's compensation from a salaried position to a fee per patient encounter (Doc. 37-2). The entire contents of the letter were as follows:

Effective November 1st, 2014 your compensation will be $26 per patient encounter.

You agree to take call for your patients during the week and rotate call on the weekends with other clinicians in your call group.

General Medicine will cover your malpractice for General Medicine patients only.

You agree to give General Medicine a 90-day notice prior to ending your relationship with General Medicine, so that General Medicine may find coverage for your patients.

You agree in the event your relationship with General Medicine ends, you will not provide services in those facilities that General Medicine provides services.

(Id.). On December 13, 2016, Plaintiff signed a "Memorandum of Understanding" which stated "Effective January 1, 2017, your compensation will be $27 per patient encounter. All other terms noted in the letter dated October 16, 2014 remain in effect" (Doc. 37-3).

Plaintiff attested, pursuant to the 2014 agreement, she was only paid $26 per patient visit

regardless of how much time she spent with a patient or the time spent charting following the patient encounter (Doc. 80 at 2). Plaintiff did not receive overtime pay for hours that she worked in excess of 40 in a given week (Id.). She did not receive any payment for time she was required by Defendant to be on call (Id.). Plaintiff attested she was routinely required to work in excess of 8 hours per day and 40 hours per week to do the job required by Defendant (Id.). In December 2016, Plaintiff's compensation was modified to $27 per patient visit (Id. at 2-3). Plaintiff's total yearly compensation from Defendants for the years of 2014 through 2018 was as follows:

| 2014 | $174,830.75 |
| 2015 | $222,480.00 |
| 2016 | $228,402.00 |
| 2017 | $219,872.00 |
| 2018 | $130,356.00 |

(Doc. 37-7 at 1).

Plaintiff declared, while providing services for General Medicine, she "did not use many of the skills or training that she received in her formal education" (Doc. 80 at 3). According to Plaintiff, while a registered nurse typically uses her discretion and judgment to evaluate a patient and perform services, while employed by Defendant, she lacked autonomy and decision-making ability with respect to the care that she provided on behalf of Defendant (Id.). Plaintiff's care was performed pursuant to a "script" dictating the treatment to be provided (Id.). She was expected to follow specific, enumerated "elements of an encounter" attached as Exhibit D to her Declaration (Id. at 3-4, 23-58). Defendant asserts the attachment Plaintiff refers to as a "script" is in fact the Guidelines for Evaluation and Management prepared and distributed by the federal government through CMS (Centers for Medicare and Medicaid Services). Plaintiff states she was reprimanded by Defendant if she tried to conduct a lower level visit than that which Defendant

General Medicine prescribed (Doc. 80 at 4).   After Plaintiff provided the prescribed treatment to a patient, she was required to chart the visit as directed by Defendant (Id.).   Plaintiff attested she lacked autonomy in the charting process and General Medicine's Rebecca Coccia would regularly require that she revise the charts she had prepared so that the work performed appeared to be more extensive for Defendant's benefit (Id).   Plaintiff stated she did not have the freedom to chart for a patient as she wanted (Id.).   Defendant does not dispute that Plaintiff was not free to chart as she wanted, and contends her charting was required to conform with CMS guidelines.

In addition to her regularly scheduled shifts for Defendant, Plaintiff was required to be "on-call" (Doc. 80 at 4).   The on-call schedule was generated by General Medicine and Plaintiff would be scheduled to be on call "several" times a month (Id.).   During the course of her regularly scheduled shifts and on-call shifts, Plaintiff received urgent and non-urgent calls, as well as text messages, to which she was required to reply (Id.).   Plaintiff attested when she was on-call she was required to be available by telephone and to make patient visits at General Medicine facilities as though she was on a regularly scheduled shift (Id. at 5).   According to Plaintiff if she was on-call she was regularly not able to attend her own personal events or obligations (Id.).   Plaintiff would put in requests to not be on call so that she could attend specific personal events (Doc. 80 at 5, 59-76).   Plaintiff received no payment for time she spent on call (Id. at 5).   Plaintiff attested she would be disciplined by General Medicine if she failed to respond to calls while on-call (Id.). Defendant Dr. Prose attested the on-call requirements were that Plaintiff (1) have a phone available to her; (2) have phone service where she was located; and (3) answer the phone when available and respond to the caller (Doc. 37-4).   According to Prose, Plaintiff was not required to travel to a facility when she was on-call and she was free to travel, including leaving the State as long as she was available to answer questions by phone (Id.).   In the event Plaintiff was unable or chose

not to respond to a call, one of two back-up persons would be called by the facility (Id.).  Prose attested that Plaintiff was not disciplined for failing to respond to a call while on-call (Id.).

In November 2017, Plaintiff was contacted by federal agents to participate in a governmental investigation of potential Medicare and/or Medicaid fraud committed by General Medicine (Doc. 80 at 6).  Plaintiff spoke with two agents and provided information about her observations of General Medicine's business practices, specifically the patient encounters and billing practices she believed to be "problematic" (Id).

In December 2017, Plaintiff founded her own company which she called Primary Healthcare (Doc. 80 at 6).   According to Plaintiff, the only services she provided through Primary Healthcare were ear cleaning services (Id.).  General Medicine did not provide ear cleaning services, so the services provided by Plaintiff through Primary Healthcare were distinct from the services she provided while simultaneously working for General Medicine (Id.).   General Medicine disputes that Plaintiff's company only provided ear cleaning services.  A compilation of the billing records from Primary Healthcare shows approximately 9% of the services were for ear cleaning (Doc. 81-3 at 1).  Primary Healthcare's billing records list twelve procedure codes that were billed by both Primary Healthcare and General Medicine (Id.).  Defendant cites the billing records to assert that 86% of Primary Healthcare's services overlapped with General Medicine (Id.).

Plaintiff was approached by federal investigators a second time in February 2018 (Doc. 80 at 7).  Plaintiff informed General Medicine and was told to speak with General Medicine's legal counsel (Doc. 80 at 7).  Plaintiff did not speak with authorities (Doc. 2 at 5).

On November 2, 2018, General Medicine received a rejection of a claim submitted for a patient encounter conducted by Plaintiff (Doc. 37-8).  The General Medicine claim was rejected

for payment because Plaintiff had billed for a patient encounter with the same patient on the same day through her own company, Primary Healthcare (Id.).  A practitioner is not permitted to bill twice for a service to a patient on the same day per CMS regulations (Doc. 37-4).  Defendant Prose declares he became aware Plaintiff had started her own company while still employed by Defendant General Medicine on or about December 1, 2018 (Id.).  Plaintiff's yearly total patient encounters in 2017 were 7,768 and her yearly total patient encounters in 2018 were 4,407 (Doc. 37-14).

Between December 5, 2018 and December 12, 2018, Plaintiff received multiple messages from Dr. Prose that she interpreted as threats (Doc. 2 at 6).  Defendant Prose demanded she forfeit all moneys earned by Primary Healthcare through providing services to General Medicine patients (Id., Doc. 80 at 8).  Prose threatened legal action (Id.).  Plaintiff resigned her employment with Defendant General Medicine on December 11, 2018 (Doc. 37-4 at 6).

## Legal Standard

Summary judgment is appropriate only if the moving party can demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322(1986); *see also Ruffin-Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005).  The moving party bears the initial burden of demonstrating the lack of any genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  Once a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Estate of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017) (quoting *Anderson*, 477 U.S. at

248).  In determining a summary judgment motion, the district Court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party.  *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted).

## Analysis

### *Counts I and IV – Fair Labor Standards Act*

Plaintiff alleges Defendants violated the FLSA by (1) not paying Plaintiff for "working on call from 2014-2018" and (2) not paying Plaintiff overtime at "1½ times her regular wage for time worked in excess of 40 hours during many pay periods from 2014 through 2018" (Doc. 2 at 6-7).

### *On-Call*

According to the Supreme Court, whether hours spent "on call" should be treated as work depends on whether one has been "engaged to wait" or is "waiting to be engaged." Compare *Armour & Co. v. Wantock*, 323 U.S. 126 (1944), with *Skidmore v. Swift & Co.*, 323 U.S. (1944).  The Seventh Circuit has determined that in analyzing whether an employee is working while on call, "it is best to ask what the employee can do during on-call periods. Can the time be devoted to the ordinary activities of private life? If so, it is not "work." *Dinges v. Sacred Heart St. Mary's Hosps., Inc.*, 164 F.3d 1056, 1056–57 (7th Cir. 1999).  The plaintiffs in *Dinges* were EMTs who, while on-call, had to appear at the hospital within seven minutes (not just answer a call), and they were on-call during roughly half of their evenings.  They could not drink alcohol and the short seven-minute window meant that they had to decline to attend any out-of-town family events, holidays, and other events that occurred during their call periods.  One of the plaintiffs was forced to maintain an "on call" babysitter to care for her children in the event she was called away.  The Court concluded that plaintiffs experienced less than a 50% chance that there would be any call in a 14– to 16–hour period, so their time could be used effectively for sleeping, eating,

and many other activities at home and around town.  *Id.* at 1058.

Similarly, in *Jonites v. Exelon Corp.*, the Seventh Circuit addressed the on-call scheme operated by Commonwealth Edison.  522 F.3d 721, 723–24 (7th Cir. 2008).  The company required employees to accept a certain minimum number of call-outs for emergency repairs.  Rather than being "on call" for specific shifts, however, employees were expected generally to respond to at least 35 percent of the call-outs over the course of the year, and these calls could occur 24 hours a day.  That is, the employees were not required to answer calls during specific periods, but employees had to answer a certain number of calls overall.  The employees argued that "the frequent call outs disrupt their home life," *id.* at 722, but the Seventh Circuit gave the employees' argument short shrift.  Citing 29 C.F.R. § 785.17, the Court noted that the "call-out procedure does not require that the worker stay at home or at any other designated location, but only that he be reachable by the company, and the regulation ... goes on to provide that 'an employee who is not required to remain on the employer's premises but is merely required to leave word at his home or with company officials where he may be reached is not working while on call.'"  *Id.* at 723–24.  The fact that employees must accept a certain number of call-outs at unpredictable hours was burdensome, no doubt, but the Court rejected the notion that it was so restrictive that employees should be fully compensated.  "[T]hat does not mean that he must stay in the house all weekend.  He just must stay within a two-hour radius of his normal duty station (for that is the time he is allowed for getting there if he accepts the call out).  Is that such a hardship that it turns his waiting into working? We think not ..."  *Id.* at 724.

Here, although Plaintiff alleges she was unable to travel or leave the state while on call and

that she had to be available to make a patient visit at a facility in the event of an emergency,[1] the restrictions were not such that her time could not be used effectively for personal and social activities. Based on Plaintiff's own allegations, she could request that she not be on call when she wanted to take her daughters to a specific event or planned to travel out of town. Answering phone calls, and even the need to visit a facility on occasion, would not preclude Plaintiff from doing other personal and social activities. When one considers all of an individual's potential personal activities—things like eating, sleeping, doing housework, reading, watching television, exercising, shopping—it is clear that the on-call rules as alleged by Plaintiff were not particularly restrictive at all. The restrictions placed on the plaintiffs in *Dinges* were certainly more restrictive than those alleged by Plaintiff in this case. Plaintiff's time while on call was effectively her own and the FLSA does not compel compensation. Defendants are entitled to summary judgment regarding Plaintiff's on-call claims.

*Overtime*

The Fair Labor Standards Act "("FLSA") requires that employers pay employees overtime pay if they work more than 40 hours in a given week. 29 U.S.C. § 207(a)(1). However, employees employed in a "bona fide professional capacity" are exempt from overtime. 29 U.S.C.A. § 213(a)(1). As set forth in the regulations the term "employee employed in a bona fide professional capacity" means any employee: (1) compensated on a salary or fee basis pursuant to § 541.600 at a rate of not less than $684 per week, exclusive of board, lodging or other facilities; and (2) whose primary duty is the performance of work requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized

---

[1] There is no evidence of the number of times Plaintiff actually visited a facility during her 11 years of working on call.

intellectual instruction.   29 C.F.R. § 541.300(a).

The term "fee basis" is explained as:

(a) administrative and professional employees may be paid on a fee basis, rather than on a salary basis. An employee will be considered to be paid on a "fee basis" within the meaning of these regulations if the employee is paid an agreed sum for a single job regardless of the time required for its completion. These payments resemble piecework payments with the important distinction that generally a "fee" is paid for the kind of job that is unique rather than for a series of jobs repeated an indefinite number of times and for which payment on an identical basis is made over and over again. Payments based on the number of hours or days worked and not on the accomplishment of a given single task are not considered payments on a fee basis.

(b) To determine whether the fee payment meets the minimum amount of salary required for exemption under these regulations, the amount paid to the employee will be tested by determining the time worked on the job and whether the fee payment is at a rate that would amount to at least the minimum salary per week, as required by §§ 541.600(a) and 541.602(a), if the employee worked 40 hours. Thus, if the salary level were $913, an artist paid $500 for a picture that took 20 hours to complete meets the minimum salary requirement for exemption since earnings at this rate would yield the artist $1000 if 40 hours were worked.

29 C.F.R. § 541.605 (as amended at 81 FR 32551, May 23, 2016).   It is the employer's burden to prove the application of the executive exemption.  *Bankston v. State of Ill.*, 60 F.3d 1249, 1252 (7th Cir. 1995).   The Supreme Court has instructed that we "have no license to give the [professional] exemption anything but a fair (rather than a "narrow") reading."  *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018); *Flood v. Just Energy Mktg. Corp.*, 904 F.3d 219, 228 (2d Cir. 2018) (recognizing that the application of the narrow-construction principle to the FLSA exemptions "is not the rule anymore").

Defendants contend Plaintiff was not entitled to be paid "overtime" because from October 2014 through December 2018 (1) she was paid on a fee basis and (2) she met the requirements for the professional employee exemption.  Plaintiff contends the fact that she was paid on a "per-visit" basis does not alone render her an exempt employee.  Plaintiff argues that even though she

was employed as a "nurse practitioner" the work she actually performed did not render her an exempt employee under the learned professional exemption because it did not require the consistent exercise of discretion and judgment and her advanced knowledge was not generally required to perform her work. Plaintiff asserts when seeing patients in the nursing facilities she performed certain routine enumerated tasks in accordance with specific "elements of evaluations."

The Court does not find persuasive Plaintiff's argument that the services she performed did not qualify for the learned professional exemption. The regulations provide that "registered nurses who are registered by the appropriate State examining board generally meet the duties requirements for the learned professional exemption." 29 C.F.R. § 541.301. Here, not only was Plaintiff a registered nurse serving in a clinical setting, she was a licensed Advanced Practice Nurse with a Master's Degree and authorization to prescribe controlled substances as authorized by a physician. The fact that Plaintiff was instructed to follow the Guidelines for Evaluation and Management distributed by the federal government is not evidence Plaintiff lacked any discretion or autonomy in the provision of services. Neither Plaintiff, nor Defendants provide many details as to the duties Plaintiff actually performed, but Plaintiff acknowledges that she was responsible for patient encounters and completing "charting." Dr. Prose never witnessed Plaintiff perform a patient encounter. After each patient encounter, Plaintiff would document the nature of the visit and any relevant observations during the visit. In order to determine observations that were "relevant" Plaintiff had to rely on her specialized education and training. Additionally, in answering urgent calls from facilities, as alleged by Plaintiff, she had to rely on her specialized medical knowledge to respond to questions. Plaintiff's primary duties as a nurse practitioner assessing and treating patients were the performance of work requiring advanced knowledge in a field of science that is customarily acquired by a prolonged course of specialized intellectual

instruction.

Plaintiff does not dispute she was paid on a "per patient encounter" basis starting in November 2014. Based on her salary history this change was financially advantageous to Plaintiff. For most of 2014, Plaintiff was on a salary basis and paid $174,803.75. In 2015, the first year Plaintiff was paid on a "per patient encounter" basis, Plaintiff was paid $222,480, or an average of $4,278.46 per week. Plaintiff both qualified as a professional employee and was compensated more than the minimum required for a fee basis. Plaintiff is exempt from the FLSA's overtime requirements and Defendants are entitled to summary judgment on Counts I and IV.

### *Counts II, III, V, VI – Illinois Minimum Wage Act and Illinois Whistleblower Act*

Pursuant to 28 U.S.C. § 1367(c)(3), the Court is permitted to decline to exercise supplemental jurisdiction over a state-law claim if it has dismissed all claims over which it has original jurisdiction. In this circuit, "the general rule is that, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits." *Kennedy v. Schoenberg, Fisher & Newman, Ltd.,* 140 F.3d 716, 727 (7th Cir.1998). Having determined that summary judgment is appropriate on Plaintiff's federal claims against Defendants, the Court declines to exercise supplemental jurisdiction over Plaintiff's Illinois state law claims and Counts II, III, V and VI are dismissed without prejudice.

### *Count VII – Declaratory Judgment*

Plaintiff seeks a permanent injunction restraining Defendants from enforcing the contract language which states "You agree in the event your relationship with General Medicine ends, you will not provide services in those facilities that General Medicine provides services." Plaintiff alleges the language unreasonably restricts her ability to earn a living and that injunctive relief is

her only means of securing adequate relief.

Defendants assert the Employment Agreement and subsequent modifications are the subject of a lawsuit currently pending in the Circuit Court of Oakland County, Michigan, *General Medicine, P.C. vs. Jami L. Mayhew, NP, individually and as sole owner of Primary Healthcare Solutions, Inc., an Illinois Corporation*, Case Number 2108-170568-CB, scheduled for trial on April 6, 2020. That action consists of two counts against Plaintiff and her company: (1) breach of contract by violating the Covenant Not to Compete and by using confidential information obtained as an employee of General Medicine which she improperly shared with her own company, and (2) intentional interference with contractual and business relations. Defendants contend the Initial Employment Agreement contained a forum selection clause and any interpretation of the employment agreements should, by agreement of the parties, be made by the Court in Michigan. Plaintiff argues the 2016 Agreement superseded and replaced the Initial Employment Agreement and that the operative employment agreement contained no forum selection clause.

"Under what is known as the *Wilton/Brillhart* abstention doctrine, district courts possess significant discretion to dismiss or stay claims seeking declaratory relief, even though they have subject matter jurisdiction over such claims." *R.R. Street & Co., Inc. v. Vulcan Materials Co., 569 F.3d 711, 713 (7th Cir.2009).* This discretion arises from the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202 itself, which provides that district courts "*may* declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). The discretionary nature of the Act led the Supreme Court to hold in *Brillhart* and *Wilton* that district courts have substantial discretion in deciding whether to declare the rights of litigants and may, in the sound exercise of their discretion, stay or dismiss an action seeking a declaratory judgment in

favor of an ongoing state court case. *See Brillhart v. Excess Ins. Co. of Am.,* 316 U.S. 491, 494–95 (1942); *Wilton,* 515 U.S. at 288 (noting "a district court is authorized, in the sound exercise of its discretion, to stay or to dismiss an action seeking a declaratory judgment"). While there are "no set criteria" under *Wilton-Brillhart* for determining proper declination, the "classic example" is declining to hear a federal declaratory action while an action pending in state court between the same parties will answer "the same precise legal question." *Envision Healthcare*, 604 F.3d at 986–87.

The case before the Michigan Court addresses the same legal questions regarding the terms of the "operative agreement" now being raised in the declaratory judgment claim. The Court will exercise its discretion and abstain from needlessly interfering with the ongoing Michigan state court proceedings. Plaintiff's declaratory judgment claim is dismissed on the ground of abstention.

### Conclusion

For the reasons set forth above, the Defendants' Motion for Summary Judgment (Doc. 37) is **GRANTED** and Plaintiff's cross-motion is **DENIED**. Judgment shall be entered in favor of Defendants and against Plaintiff. The Clerk of Court is **DIRECTED** to enter judgment accordingly and to close the case.

**IT IS SO ORDERED.**

**DATED:   January 21, 2020**

*s/ Reona J. Daly*
**Hon. Reona J. Daly**
**United States Magistrate Judge**